UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| POLYPORTABLES LLC,<br><br>          Plaintiff,<br><br>     v.<br><br>ENDUREQUEST CORPORATION, a company, KEN DEWING, an individual, ROBERT DAVIS, an individual, and DOES 1 through 20, inclusive,<br><br>          Defendants. | No. 1:16-cv-01291-DAD-SKO<br><br>(Doc. No. 4)<br><br><u>ORDER DENYING PLAINTIFF'S APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE</u> |

      Presently before the court is Polyportables LLC's ("plaintiff") application for a temporary restraining order ("TRO") seeking to enjoin Endurequest Corporation, Ken Dewing, and Robert Davis (collectively, "defendants") from misappropriating plaintiff's trade secrets and from engaging in unfair business practices. (Doc. No. 4.) Plaintiff filed the TRO concurrently with its complaint on August 31, 2016. (Doc Nos. 1, 4). For the reasons discussed below, the court denies plaintiff's application.

**I.    Factual Background**

      The following information is taken from plaintiff's complaint, application for the TRO, and accompanying declarations.

      Plaintiff—a Georgia based corporation—"is an industry leader in manufacturing, distributing and selling portable restrooms, hand wash stations, and other related products and

1

accessories." (Doc. No. 4-3, Declaration of Jeff Thomas ("Thomas Decl.") at ¶ 2.) One of plaintiff's products is a portable wash station known as the "Tag Along." The Tag Along is free standing and designed to fit inside of a portable bathroom for ease of transport. The product generates significant revenue for plaintiff. For example, in 2015, plaintiff sold 5,000 units, equaling $2 million in revenue. (*Id*. at ¶ 9.)

The genesis of the Tag Along dates back to 2002, when plaintiff began working with defendant Endurequest to design and manufacture the tools—which were subsequently purchased and marked by plaintiff—needed to produce the Tag Along. (*Id*. at ¶¶ 8, 9.) After designing the tools, plaintiff hired defendant Endurequest to manufacture the Tag Along. (*Id*. at ¶ 9.) Up until January 2016, defendant Endurequest "was the sole manufacturer of the Tag Along." (*Id*.)

The relationship between plaintiff and defendant Endurequest was governed by two agreements. The first agreement was signed in January 2000, two years before the inception of the Tag Along. The contract—titled "Warehouse Distribution Agreement"—provided, in part, that defendant Endurequest would be bound by a confidentiality clause.[1] (*Id*.) On January 2003,

---

[1] The confidentiality clause states as follows:

> In connection with the performance of its services hereunder, [Endurequest] shall receive certain information, data and documentation concerning the Products and PolyPortables' customers. [Endurequest] hereby acknowledges that such information is proprietary to and a valuable trade secret of PolyPortables and that disclosure of such information or its use by others could cause irreparable loss to PolyPortables. [Endurequest] shall receive all such proprietary information in complete and strict and shall exercise reasonable care to maintain such confidentiality. [Endurance] shall not during the term of this Agreement or any time thereafter, directly or indirectly, divulge or disclose to any person or entity any such proprietary information which was obtained by [Endurequest] pursuant to the performance of its services hereunder. Additionally, during the term of this Agreement or any time thereafter, [Endurequest] shall not utilize such information to produce or duplicate the Products. Such proprietary information shall be utilized by [Endurequest] only in the furtherance of its services to PolyPortables hereunder and for no other reason. Upon the termination of this Agreement, [Endurequest] shall immediately return any and all proprietary information to PolyPortables, including but not limited to all records kept by [Endurequest]

1  plaintiff and defendant Dewing—the founder, owner, and president of Endurequest—signed a
2  second agreement—titled "Non-Compete Agreement"—agreeing that he and defendant
3  Endurequest would not use—either directly or indirectly—plaintiff's proprietary information for
4  their personal benefit. (*Id.* at ¶ 6, Exh. 2 at ¶ 4.) Defendants Dewing and Endurequest also
5  agreed to not "divulge, disclose, or communicate" plaintiff's proprietary information in any
6  manner. (Thomas Decl. at ¶ 6, Exh. 2 at ¶4.) Lastly, the agreement contained an "injunction
7  clause" granting plaintiff the right to seek an injunction against defendants Dewing and
8  Endurequest should they violate the Non-Compete Agreement. (Thomas Decl. at ¶ 6, Exh. 2 at ¶
9  7.)

10    In 2002, plaintiff hired defendant Davis as its West Coast division Sales Manager, a
11  position he held until his voluntary resignation in January 2016. (Thomas Decl. at ¶ 4, Doc. No.
12  4-4, Declaration of Eric Capers ("Capers Decl."), at ¶ 3.) Defendant Davis worked out of
13  defendant Endurequest's facilities. (Capers Decl. at ¶ 5.) In 2012, plaintiff learned that defendant
14  Davis was a silent investor in defendant Endurequest. (Doc. No. 1 at ¶ 27.) In December 2013,
15  plaintiff provided defendant Davis with an employee handbook, which contained a section
16  informing employees of their non-disclosure duty regarding plaintiff's proprietary information.
17  (Thomas Decl. at ¶ 20.) Defendant Davis signed a form acknowledging receipt of the handbook.
18  (*Id.* at ¶ 21, Exh. 4.)

19    In 2013, defendant Endurequest submitted a proposed redesign of the Tag Along to
20  plaintiff. (*Id.* at ¶ 10.) Plaintiff rejected the proposed redesign; nonetheless, plaintiff decided to
21  work with defendant Endurequest to make other alterations to the Tag Along. (*Id.* at ¶ 11.)
22  Plaintiff based these changes on feedback and input received from customers as well as from
23  plaintiff's own operations teams. (*Id.*) According to plaintiff, defendant Davis "participated in
24  ongoing internal discussions regarding the redesign of the Tag Along." (*Id.* at ¶ 12.) Plaintiff

---

26    containing names, addresses and other information concerning
       PolyPortables customers. No proprietary information shall be
27     copied except as otherwise permitted by PolyPortables.

28  (*Id.* at ¶ 5, Exh. 1 at ¶¶ 1, 2.)

3

considers the information shared with defendants to have been proprietary information. (*Id*.)

On November 11, 2014, plaintiff informed defendant Dewing it would be transitioning some of the manufacturing of the Tag Along to Georgia. (*Id*. at ¶ 14.) According to plaintiff, in December 2014, defendant Dewing informed plaintiff that he and defendant Endurequest "no longer wished to be involved in the redesign process." (*Id*. at ¶ 15.)

On January 11, 2016, defendant Davis informed plaintiff he was resigning from his position. (*Id*. at ¶ 22.) Defendant Davis also gave plaintiff a letter from defendant Endurequest giving plaintiff 60-day notice of its intent to terminate the Warehouse Agreement. (*Id*.)

In February 2016, plaintiff discovered that defendant Endurequest had designed and manufactured a prototype portable sink called the "Stowaway." (*Id*. at 23.) On February 24, 2016, plaintiff's employees saw the prototype on display at a trade show. (*Id*.) According to plaintiff, the prototype was "a copy of the Tag Along but with additional features that directly reflected [plaintiff's] ideas for [the] redesign of the Tag Along, ideas that [plaintiff] had shared with [defendant] Endurequest during the redesign process pursuant to the parties' confidentiality and non-compete agreements." (*Id*.)

By late June 2016, plaintiff had discovered that defendant Endurequest was selling the Stowaway. (*Id*. at ¶ 25.) According to plaintiff, it learned of this from one of its own customers who cancelled a previously submitted and delayed order for Tag Alongs and instead ordered and later purchased approximately 200 units of the Stowaway.[2] (Capers Decl. at ¶ 13.) In late July or early August 2016, plaintiff learned that defendant Endurequest had approached plaintiff's largest customer, United Site Services ("USS"), and had sent USS a sample of the Stowaway. (Thomas Decl. at ¶ 26.) On August 18, 2016, USS informed plaintiff it had been communicating with defendant Endurequest about the Stowaway and would now require the companies to submit competing bids. (Capers Decl. at ¶ 16.) On August 23, 2016, USS informed plaintiff the Stowaway had some better design aspects than the Tag Along; according to plaintiff, the design

---

[2] According to plaintiff, the order of Tag Along was delayed in part by the need to repair damage to the Tag Along molds. Plaintiffs allege defendant Endurequest's neglect and mistreatment of the molds led to their damage. (*Id*. at ¶ 31.)

4

aspects noted by USS were the subject of the redesign discussions that took place in 2013 and 2014 between plaintiff and defendants. (*Id*. at ¶ 17.) On August 25, 2016, plaintiff learned that USS placed an order for 120 units of the Stowaway instead of the Tag Along. (*Id*. at ¶ 18.)

Plaintiff filed its complaint in this action on August 31, 2016. (Doc. No. 1.) Therein, plaintiff alleges six causes of action, including: (1) misappropriation of trade secrets pursuant to California Civil Code §§ 3426 *et seq.*; (2) breach of contract under Georgia common law; (3) breach of contract under California common law; (4) breach of the duty of loyalty, against defendant Davis; (5) aiding and abetting the breach of the duty of loyalty, against defendants Endurequest and Dewing; and (6) violation of California's Unfair Competition Law, codified at California Business and Professions Code § 17200. Concurrent with the complaint, plaintiff filed their motion for a TRO which is the subject of this order. (Doc. No. 4.)

## II.     Legal Standard

The standard for issuing a temporary restraining order is "substantially identical" to the standard for issuing a preliminary injunction. *See Stuhlbarg Intern. Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). "The proper legal standard for preliminary injunctive relief requires a party to demonstrate 'that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)); *see also Center for Food Safety v. Vilsack*, 636 F.3d 1166, 1172 (9th Cir. 2011) ("After *Winter*, 'plaintiffs must establish that irreparable harm is likely, not just possible, in order to obtain a preliminary injunction.'"); *Am. Trucking Ass'n, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009). The Ninth Circuit has also held that "[a] preliminary injunction is appropriate when a plaintiff demonstrates . . . that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor." *Alliance for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011) (quoting *Lands Council v. McNair*, 537 F.3d 981, 97 (9th

/////

/////

Cir. 2008) (en banc)).[3]  The party seeking the injunction bears the burden of proving these elements.  *Klein v. City of San Clemente*, 584 F.3d 1196, 1201 (9th Cir. 2009).  Finally, an injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter*, 555 U.S. at 22.

## III. Analysis

"The propriety of a TRO hinges on a significant threat of irreparable injury that must be imminent in nature."  *Farmers Ins. Exchange v. Steele Ins. Agency*, No. 2:13-cv-00784-MCE-DAD, 2013 WL 1819988, at *1 (E.D. Cal. Apr. 30, 2013) (citing *Caribbean Marine Servs. Co. v. Baldridge*, 844 F.2d 668, 674 (9th Cir. 1988)).  That imminence of irreparable injury is of central importance in granting a TRO as reflected in Local Rule 231(b)'s mandate that "[i]n considering a motion for a temporary restraining order, the Court *will* consider whether the applicant could have sought relief by motion for preliminary injunction at an earlier date without the necessity for seeking last-minute relief by motion for temporary restraining order."  L.R. 231(b) (emphasis added).  The rule further instructs "[s]hould the Court find that the applicant unduly delayed in seeking injunctive relief, the Court may conclude that the delay . . . contradicts the applicant's allegations of irreparable injury and may deny the motion . . . ."  *Id*.

Here, plaintiff's own pleadings reflect that it first had reason to believe defendants misappropriated its proprietary information in February 2016 when it learned that defendant Endurequest had designed a portable sink.  That this was not merely a rumor was confirmed when plaintiff's employees saw the Stowaway on display at a trade show back on February 24, 2016.  Furthermore, by June 2016, plaintiff had discovered its own clients were purchasing Stowaway units from defendants.  Despite confirming the existence of the Stowaway, as well as defendants' intentions to sell the product to its clients, plaintiff nonetheless waited until the end of August 2016 to file a complaint and seek a TRO.

---

[3]  The Ninth Circuit has found that this "serious question" version of the circuit's sliding scale approach survives "when applied as part of the four-element *Winter* test."  *Alliance for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134 (9th Cir. 2011).  "That is, 'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest."  *Id.* at 1135.

Plaintiff claims it delayed in seeking the TRO because it was not sure "whether [defendant] Endurequest planned to compete directly with [plaintiff] for the same customers." (Thomas Decl. at ¶ 25.) However, defendants' intent to compete with plaintiff appears to have been made clear to plaintiff by June of 2016 when it was informed by one of its clients that it was cancelling a previously submitted order because it had instead ordered the Stowaway from defendant Endurequest. Moreover, plaintiff's excuse does not account for the even more significant delay in attempting to enjoin defendants' misappropriation of propriety information, a fact of which plaintiff appears to have been well aware of by no later than February 24, 2016.

Ultimately, plaintiff has failed to establish that it lacked the ability to seek a preliminary injunction at an earlier date. The months' long delay between learning of defendant's alleged misconduct and the filing of the pending motion seeking a TRO undercuts plaintiff's allegation of imminent, irreparable harm. Accordingly, the issuance of a TRO is not warranted in this instance. *See Farmers Ins. Exchange*, 2013 WL 1819988 at *7 (denying TRO because of six month delay between discovery of alleged wrong and filing); *see also Occupy Sacramento v. City of Sacramento*, No. 2:11-cv-02873-MCE-GGH, 2011 WL 5374748, at *4 (E.D. Cal. Nov. 4, 2011) (denying TRO because of 25 day delay in seeking the order); *Rosal v. First Federal Bank of California,* No. C 09-1276 PJH, 2009 WL 837570, at *2 (N.D. Cal. Mar. 26, 2009) ("[T]he court finds that plaintiff's delay in requesting a TRO militates against its issuance. Plaintiff was aware of the non-judicial foreclosure sale in June 2008, but did not file suit until March 2009.")

**IV.    Conclusion**

For all of the above stated reasons, plaintiff's motion for a TRO (Doc. No. 4) is denied without prejudice to plaintiff's filing of a properly noticed motion for preliminary injunction.

IT IS SO ORDERED.

Dated:   **September 2, 2016**                         _____
                                                                          UNITED STATES DISTRICT JUDGE

7